May it please the court, good morning. I'd like to try to reserve five minutes for rebuttal. There are two issues in this case. The first is whether the district court applied the wrong standard of review and the second is whether Unum wrongfully denied benefit to plaintiff. The standard of review issue is extensively discussed in our briefs and with my limited time with the plaintiff, I'd like to focus on why Unum's denial was unreasonable under any standard of review, if that's acceptable to the court. The question in this case is whether defendant Unum wrongfully denied long-term disability benefits to plaintiff. Plaintiff suffers from Ehlers-Danlos syndrome type 3. EDS is a rare genetic progressive disease that causes the connective tissue throughout the body to be weak. EDS patients suffer spontaneous dislocations of joints throughout their body, muscle spasms, gastrointestinal issues, and cognitive and neurological deficiencies, all of which cause chronic severe pain and fatigue. The pain is not idiopathic. It is medically established that the symptoms of EDS cause severe pain. There's no cure for EDS and there are no effective medical interventions. Unum concedes that plaintiff was defamed by her EDS. Can I ask you a question about, so I see you're emphasizing the pain and I think that is kind of important because when I read the record here, and I actually do think the standard of review matters some because, but when I read the record, you have Ms. Gary has a problem that she goes and gets surgery to fix with her neck and it's causing serious problems and it looks like there was pretty strong evidence in the record that that got, that saw a lot of improvement after the surgery. A lot of the problems she was having that seemed to be associated with that and that's to me seems to be the basis of Unum's denial. It also looks like sort of as that problem was getting better, I guess the first question I've got for you is, do you guys acknowledge or what's your position on whether or not that problem was resolved by the surgery, the problems that she was having, putting aside the pain and other things, but those, you know, the problems from the neck problem. So there are physical manifestations of this disease and there are cognitive and neurological manifestations of this disease. The surgery was necessary in order to address mostly cognitive deficiencies caused by the fact that the plaintiff's neck vertebrae had dislocated and her skull was impinging her brainstem. The surgery improved her cognitive capabilities but there was a lot more going on both before and after that surgery. As Dr. Henderson said to her at the time of the surgery that that surgery was no panacea for her EDS and that her symptoms may remain and may progress. And while the surgery did help the cognitive issues, the record is replete with observations of objectively identifiable symptoms unrelated and unresolved by the surgery. So the odd thing, so I hear what you're saying and that seems consistent with what the odd thing, you know, she didn't, the pain itself and other problems were not keeping her from being able to work. It seems like what actually caused her to finally not be able to work, well we know that because she was told by her doctor stop working, right, because of the neck problem. So she went in and got surgery and she did seem to see some improvements on, the record indicates improvement for cognitive issues and some other issues, but it also does that she seemed to be almost having more pain right after and maybe that was because the improvement in the nerves caused her to actually feel more pain. So it seems like what happened here was the reason she needed to end working was because of the neck problems. That got resolved but perhaps during that period of time other problems from the EDS sort of became larger. I mean they must have become larger because before the neck problem she was able to work, right, so they weren't so large she couldn't work before the neck problem. So if it's true that they're causing her not to be able to work now, they magnified or something. So it's a little bit of an odd situation it seems like from your perspective, if we were to agree with you or if your theory of this is correct, that it's that the original thing kind of period. That seems to be kind of your theory, isn't it? No, it's not exactly, Your Honor. The record shows that Ms. Gary was suffering significant physical as well as cognitive symptoms of her EDS as early as 2012. That she was suffering dislocations, painful dislocations and intractable muscle spasms. She had a significantly dislocated knee and developed a clot. She was missing work and trying to return but missing work because of the physical symptoms before the surgery. Over the period of 2013, the cognitive issues got worse as her brainstem became impinged but the physical symptoms were there all along. And there is evidence in the record that perhaps her pain from those physical symptoms increased after the surgery because her nerves were working better. But the record is very clear that these debilitating symptoms, particularly the physical symptoms, were there throughout. No, I know that but they weren't keeping her from being able to work obviously because she was, it sounds like maybe she was missing some work and and I don't remember exactly what the record that I saw wasn't particularly clear about whether she actually got fired and maybe that was part of the reason that she ultimately ended up having to leave the law firm. But it does seem like while they were, I'm not saying they're not significant or something, but they weren't significant enough that she couldn't work. The thing that caused her to stop needing to work it seems like was the neck thing. The neck thing got some relief and there's some evidence in the record, I believe, there was even hope by her doctors. She's getting better and we're hoping that she can go back to work at a certain point. And then it seems like other things kind of overtook that. So I still not, it seems like that description I gave of the stuff that actually caused her to first be disabled, which I think even Unum agrees with now, right, because they agree that she became disabled for a period of time. The stuff that caused it kind of maybe got resolved but but then the whole question this case becomes whether or not other stuff became significant enough that that itself kept her from working. Because I don't, to be clear, is your position that her neck stuff is still what is causing her to not be able to work or is it other stuff from the EDS? Well she's, let me answer, that's a two-part question, so let me answer both. The answer to the first question is, is this is a progressive disease. And so it is not unexpected that from when she was diagnosed as the disease progressed that her symptoms would get worse. Secondly, the surgery improved her cognitive function, certainly. But as Dr. Posinke, who is the EDS expert in this case, opined twice, that he opined that having seen her and observed her over five years, including the period before and after her surgery, his opinion was that she could not perform either the physical or the cognitive requirements of full-time law practice as Unum defined it. And her physical symptoms right around the time that Unum claims she could go back to the full-time practice of law, April 6, 2015, Dr. Heinz, a rheumatologist who saw her for her EDS, saw her in March 2015, one month before Unum said she could go back to work full-time as a practicing lawyer. And Dr. Heinz observed the hypermobility in her and he prescribed oxycontin and Percocet, opioids, in order to try to control her pain. And he opined that she might be able to return to her law practice in a year or two. That's one month before April 2015. Four months later, he saw her in August 2015. That's four months after Unum said plaintiff was recovered enough to return to work. And he made almost the same identical findings. And those findings are consistent throughout this record. Now, what Unum did was it ignored all of that evidence. It focused on her surgery as if that were the disability. And it is undisputed that it is not. Her disability is the EDS. And they focused on her cognitive deficiencies, which were improved by the surgery. But they ignored all of the evidence of the treating physicians who said consistently that she was unable to perform as full-time as a practicing lawyer. Now, what did Unum do instead? They hired reviewers with no EDS experience at all. And they never consulted anyone who had that experience. Can I ask you? Uh-huh. So, you know, this goes to the level of review also. But one of the arguments as to whether or not they should have had their own physical doctor actually look at Ms. Gary as opposed to just having reviewing doctors. And their argument is, yeah, but it wouldn't have done any good because this was years later. And so it doesn't really help us with the timeframe. And I'm guessing the reason they didn't want to do it is because it seems like at least, I mean, it's not even clear that they're even disputing that she is disabled now or was disabled in 2018. So they don't want to review her then because it's not going to help them for the 2000, for that period, you know, that 2015 period that they want to target. But they do have a point that, like, what would it tell them, you know, two years, three years later, what would it tell them about the time, you know, when, about that 2015 point? Well, as the Sixth Circuit said in the Guest Marquette case, an in-person exam is almost essential in an EDS case. Now, remember that the April 6, 2015 date is something that UNUM injected into this case, that their orthopedic surgeon said she should have been recovered from the surgery by then, even though we know that the surgery was just to treat some of the symptoms of her ongoing EDS. But what an in-person exam would have done is that if, and also I want to point out that Dr. Dunn, their orthopedic surgeon who chose that date, recommended that the next step be an in-person exam. And when UNUM said reconsider that, Dr. Dunn said, well, never mind. And that's evidence. You're kind of running out of time, and I want to make sure you have some rebuttal, but the key question I wanted is, what would knowing that her, let's say her, well, maybe I'll just ask you on rebuttal, is the question, if you can. Let me answer that question very quickly. What it would have shown is that it would have shown that in 2016, after the claim was filed, if they'd done an IME, it would have shown the symptoms, the intractable symptoms and the pain that they were causing, and it would have forced UNUM to consider and address whether or not it was plausible that she would have those disabling symptoms in 2015, she would have them in 2016, but somehow there was a remission in the middle, and that's implausible. And if it's okay, I'd like to reserve the rest of my time. Thank you very much. Mr. Miller. It pleases the court. I represent UNUM Life Insurance Company of America. With respect to an IME, counsel explained that this is a progressive disease, and so taking an IME in 2016 would have an arguable impact on any condition that occurred that was in place before that. So as a progressive disease, an IME... Mr. Miller, it would be... Exactly. I think that's right. It wouldn't be dispositive, right, because she's, you know, in theory, she's getting worse. It seems like that's... It seems like some things were getting worse as her neck was getting better. Some things were getting worse. But it would still be some evidence, right? It would still be some evidence, and I think we all probably think, including UNUM, that that evidence would have come back saying that she was disabled then, which would have put UNUM in a tougher spot because then they would have been forced to, like, actually say, yeah, she's disabled now, but she wasn't disabled a year earlier. So the reason that matters to me is your opposing counsel didn't want to talk about the whole credibility, or not the credibility, but the standard review issue, but it's those kind of decisions by UNUM that caused me to think, is UNUM really acting as a independent sort of decider here, or are they acting in their own interest? And those kind of things seems like kind of the Ninth Circuit standard, those things would weigh in favor of us, the district court, having a higher level of skepticism. Yes, Your Records, when counsel refers to findings of disability by Dr. Pasinke, what she's referring to is opinions that she can't do the work. And as recently as 2016 and 2020, this court in two separate cases has cited Jordan versus Northrop Grumman for the proposition that a disability carrier can expect evidence of objective inability to do the work. In other words, even if what the complaint is, is pain or just opinions by the doctor, there's still a requirement to prove an inability to do the work. But UNUM chose this April 6, 2015 date, as I understand it, exclusively on a pre-surgery projection, as to whether, as to when the surgery would have resolved. On the other hand, her doctor, Dr. Chinsky, said in January, after the surgery, that it would take another 12 to 18 months for Gary to rebuild tone, stabilize large joints, and restore energy reserves. And that was before April 6, 2015. And so why are we relying on some pre-operative projection on a date? Your Honor, you're correct that the pre-operative projection was part of Dr. Dunn's opinion, and he said that the... Well, what Dr. Dunn said is that the surgeon anticipated six months recovery period. And what Dr. Dunn said was, that would be reasonable to say that she would be disabled from work during that time. But then what UNUM did, and what Dr. Dunn did, was look at the totality of the records after that, to determine whether or not there were findings of restrictions and limitations... What about this January, 2015 opinion of Dr. Chinsky? That was not a statement about return to work. It was a statement about building tone, stabilizing large joints, and restoring energy reserves. You're absolutely right, Your Honor. And so what was important at that point was to look to determine whether there were findings of restrictions and limitations in the medical records during that 12 month period and beyond. And what they found was there were not. I could turn to the issue of cognitive function with respect to Dr. Posenki's findings. Dr. Posenki was the one who referred Ms. Gary to the... for a neuropsychological review with Dr. Beshe in 2014. Dr. Beshe said, we ought to do a follow-up in 12 months or sooner if there are problems. Twelve months after that neuropsych exam in January, 2014, Dr. Posenki saw Ms. Gary in 2015, and he said she was doing better cognitively, and he did not recommend any follow-up. There's no further follow-up at all for cognitive testing until cognitive testing was done after the claim was made. So I wanted to touch on that. I do think that Judge Van Dyke has turned to the issue of weighing the evidence in the light most favorable to non-moving party when Univis is determining what... or I'm reviewing Univis discretionary authority. And before the court weighs the evidence, or I'm sorry, before the court views the evidence in the light most favorable to the non-moving party, Ms. Gary in this case, the Supreme Court in 1986 opinion Hatshepsut versus Zianeth instructed that a court must make an inquiry on summary judgment into the plausibility of inferences from direct evidence. And then this court two years later in McLaughlin versus Luce said inferences from a non-party's specific facts... The difference in standard between the summary judgment standard that is applied with inferences most favorable to Ms. Gary for the standard of review, I mean, that seems pertinent to the district court's assignment of the case-specific issues with respect to the merits, which seems to be just a clear legal mistake, isn't it? That you take those into view which should have been judged under one standard and you fold it into the merits which has a different standard. Why isn't that just a flat-out legal error? I don't think that's what happened here, Your Honor, and I think what this court instructs is that the court must first determine if inferences are drawn only if they're reasonable in context with other undisputed background or contextual facts. So before the court considers the what the inferences are that is that evidence. Now direct evidence, I'll give you an example. Let's say the claims history of, you know, there's direct evidence that they have a bad claims history and there is direct evidence that they took up steps to mitigate that. The court looked at that and determined that some weight would be given to that, not great weight, but based on the direct evidence. So an example of inferences from direct evidence would be the statement that Ms. Gary said should be considered as an element of bias and that is that you know took one statement out of context. Now the court accepted that as direct evidence. There's one statement taken out of context. The court then looked at the broader medical records to see if out of context was misleading because Ms. Gary was looking for an inference that it was misleading and therefore bias that would bear on the degree of... So Mr. Miller, I don't know if that's, so I'm looking at page 34 of the decisions, that's exception record 34, and it's also 34 of the district court. And the district court, at the bottom of that, this is the, you know, district courts going through each of the various factors that you look at to see what level of skepticism and the heading on that one is inconsistent reasons for denial. So this is the self-dealing, the bias, the cherry-picking, that sort of thing. If I were to adequately investigate. And the court says, on the beginning of that last sentence, that the court finds these factors do not weigh in favor of a heightened scrutiny of defendants' decisions. So that's just a conclusory, in a sense, right? And then as to the specifics, the next sentence, it's more appropriate to discuss them in the merits discussion of the opinions since they can't be separated from plaintiff's overall arguments. But I think Judge Collins' question was, you can't really do that when you're talking about two very different standards of review. The one is abuse of discretion, if you're talking about the merits, and when you're doing it here, you're supposed to actually be taking them in the light most favorable to the plaintiff. So, I mean, that seems to be just blatant error, like are you aware of any other case where a court did that, where it took, in this context, because it's a joint context, I think it has these two different standards of review, and merged them together and said, I'm going to address these issues under the analysis that has the much more deferential standard of review to the insurer. I don't believe that's what the court said, Your Honor, because in, for instance, the court does say that the court will weigh the evidence determined to weigh it in terms of the skepticism, but that's different. That's not viewing it in the light most favorable, and what the judge did here is follow Matsushita and also the McLaughlin and the TW Electric Services case. When they looked at that, when there was a discussion of the records, first it's preceded by 13 pages of the analysis of the record, and then another five pages of Unum's treatment of that analysis. But it's still true that when he, he not only said that he was going to do it in a deferential way, but he eventually, as to the particulars, but he did. I mean, he goes on and he says that it was reasonable for the defendant to conclude X, or that the defendant reasonably disregarded Kaczynski's and Henderson's notes, and I mean, so on, all the way through while he is actually dealing with the particulars, he is it. Not only generically, but as to specifics, doing a deferential review. Your Honor, that, the use of the language reasonable specifically follows the requirement at that point of the McLaughlin case that only if inferences can be drawn, only if they're reasonable in context with other undisputed backgrounds or facts. So, in determining the level of skepticism to apply, determining what evidence bears on that, the court has to determine what are reasonable inferences to be drawn. Now, mixing it into this latter part of the decision, you have to first look at the court's treatment of it in the earlier part of the analysis, but the court is going through a determination of reasonableness of the inferences as to whether or not there is evidence in the form of an inference to support the inference of bias that Ms. Garrett sought. Now, I don't think just because it is analyzed in the merits portion means that the court applied the wrong statement, and the reason that that's- But Judge Berzon's point is, I think it's right. You know, he says he's going to do this, and I don't recall after page 34 of the decision when the court gets to the merits, if the judge ever talks about applying the normal summary judgment standard, right? He's applying deference, abuse of discretion standard all the way through. And so, if you're right, the judge is doing this thing you're doing, but he's not saying that's what he's doing. But the court is saying what is a reasonable inference, and that's what Judge Berzon quoted. What is reasonable to infer from this one direct fact that in the context of all of the facts, and that's why the court, I believe, used that word- I was not referring to any particular fact. I was saying that all the way through this analysis, at every junction, the district judge talked about whether the rule was reasonable, whether the decision was reasonable. Now, if that is going to govern, it seems, as I understand it, that if you're going to apply more skepticism, then you're going to look for something more than simple reasonableness. That's right, and the court did apply a moderate level of skepticism after finding the evidence that did bear on the bias, and the court looked at a lot that bore on the bias. As I said, there was the claims history. There was taking one sentence and relying on one sentence and then determining if that was, you know, contextually an evidence of bias. There was whether or not there was an adequate investigation. The court looked at each of these and assigned at the end- I don't think the court looked at all of them, though, Mr. Miller. Like, you know, so Dr. Haller cherry-picked stuff from Dr. I don't know if I'm going to say his name right, but Pachinki's form. You know, he says some stuff about her not being able to perform strenuous activity, but he disagrees with other- you know, he doesn't- and the judge didn't seem to really get in and look at those things, and I think it was probably because the judge, by the time the judge was looking at that stuff, was applying a differential standard of view, it seems to me. Judge Van Dyke, if you look at the analysis that the court performed at pages 18 through 23, the court looked to see if there was cherry-picking from the medical records, and what the court found was there was a thorough analysis of all of the medical records so that from time to time when Ms. Geary would say there was cherry-picking, what the court did was determine was this in fact cherry-picking and ignoring evidence. So, for example, let me turn to the Yaks case, where the court found they just flat-out disregarded the opinion of the treating dentist. They didn't even bring on an orthodontist or a dentist to give an opinion. They just disregarded it. The same thing in the Heald decision. No deference was applied at all because they simply disregarded the evidence that they offered. The same thing in Staphon. The court denied the insurance request for deposition. Let me give you an example. So, going back to Dr. Haller's report, I don't remember that the district court actually talked about this, but Dr. Haller took some things from what Dr. Pasinke said, but he did not talk about the fact that Dr. Pasinke advised Geary to stop working immediately and that he didn't support her return to work. He doesn't mention that. He also reached out, Dr. Haller reached out to Dr. Henderson, and Dr. Henderson said he did not agree with Dr. Haller that she should not go back to work, and he specifically said that she was precluded from performing her occupational demands, but that response didn't appear in Dr. Haller's record that I don't think that the district court judge actually picked up on. And again, am I wrong about that, that this particular issue where Dr. Haller, it seems to me, took some stuff but not others, is that mentioned by the district court? I don't know. No, Your Honor. What is mentioned by the district court is whether or not there are findings and limitations that would support disabling restrictions, and in that regard, the court is following, as I mentioned earlier, the W versus Unum Life Insurance Company opinion from 2020 from this court, and Leslie versus United. But does the district court, so the district court didn't talk about that, which it seems like if he was applying the, you know, the taking the evidence in light, most favorable plan, you know, and going back to something we talked about earlier, I can't remember if it was with your opposing counselor or not, but it had to do with this, and I think it was you, it had to do with this April 6th date, you know, and Dr. Dunn picked that arguably based on Dr. Henderson's notes. It's one thing he picked from Dr., but what he didn't, but what he didn't do is Dr. Pasinke in December 2014 had actually said that it might take her, it might take her until October 2015. So what's that like six more months after that? And then, and then I think Judge Berzana mentioned that just like a month or so later, he said it could take another 12 to 18 months. So again, that feels like cherry picking a little bit that, in other words, Unum's doctors were picking certain things out. I'll take this six month date, but I'm not going to take these other dates, and the district court judge didn't really analyze that, and I think it, isn't that because the district court judge didn't apply that, you know, was not applying the normal summary judgment, but was implying a set of abuse of discretion standards? Well, your honor, the district court represents that it took into account all evidence on page six of the opinion. It took into account all of the evidence, and while it didn't address every single point, this is a 2,000 page record, it did address the question of whether or not... The question is what legal standard he applied in doing it. I have one final question, and your time is up, but in the conclusions of the final Unum denial letter, there is a paragraph that says that she was, her cervical, after April 16th, her cervical spine was stable, and clinical and imaging findings had precluded her from performing the sedentary functional demands of her regular occupation, and her other conditions, including EDS, no longer precluded her from performing sedentary functional demands required for her regular occupation, but she was a lawyer, and the record, and she was insured as a lawyer, right? And the record establishes some standards by which one determines what the demands of a lawyer are, they're not just sitting there, and there is no analysis at all of the effect of the pain, for example, on her judgment, and her ability to continue with the amount of time that lawyers work. There's no recognition anywhere in here that this woman is not just sitting there being a clerk, or a receptionist. Your Honor, there are no findings, there are no findings by the doctors, and for example, Dr. Pasinke's opinion that she shouldn't work is one thing, but there are no findings, and so there is, what Unum found, again, was that Dr. Pasinke did not recommend a year after the additional cognitive testing that she'd be retested, with respect to whether or not she could drive. I'm talking about the fact that lawyers, even if their brains are operating perfectly well, are not, to judge them against a sedentary occupation with regard to their physical problems doesn't necessarily seem appropriate. The findings in physical therapy in 2017 with respect to restrictions and limitations aren't present in the 2015, or the post-April 2015 records and the disabling, it was not, it was later measured in 2017 as reflected in physical therapy. We read a lot of just social security records, and there are findings about people being able to do sedentary occupations, sedentary occupations. You're cutting in a little, cutting in and out a little bit, Judge. I'm sorry? You're cutting in and out a little bit. Sedentary occupations are things like that. They're not being a lawyer. So there is no, there's no measuring in this analysis anywhere of her ability against the requirements of being a lawyer. Your Honor, the record is replete with the description of what the lawyer's duties are under a vocational... I understand, but I'm reading from the conclusion, which says that she could do a sedentary occupation. You're correct. You're correct, Your Honor. And nothing else. That's what the letter did, based on the analysis that's in the administrative record, Unum concluded, based on the vocational requirements of being a lawyer, Unum concluded that there was no evidence... I'm saying it doesn't even say that. It says you can do a sedentary occupation. All right, thanks. The record analyzes that. Well, fine. Thank you very much. Thank you, Your Honor. Your time is up, and we will give you two extra minutes to rebuttal. Thank you, Your Honor. Thank you. I have three points to make. First, Mr. Miller said several times that there's no evidence of physical restrictions to perform the sedentary job as defined by Unum. Actually, there are. If you look at Dr. Posinke's letters in 2016 and 2017, he specifically discusses the physical requirements of being a lawyer and the cognitive requirements of being a lawyer as defined by Unum, and he opines to a reasonable medical certainty that at no time from 2015 forward was plaintiff able to perform any of those physical and cognitive duties. So the claim. Secondly, I guess I'm going to talk about the standard of review, and I want to make one point that didn't come up in the court's discussion with Mr. Miller. All of the points that the court discussed that point toward heightened review are present in this record, and we've explained how the court failed to apply the appropriate summary judgment standards in determining what level of review to apply. But one thing that didn't come up is that there is evidence of serious procedural irregularities in this case. The district court found on summary judgment that Unum violated plaintiff's right of full and fair review by changing the basis entirely for the denial from its first denial to its final denial, and then denying her an administrative review of the final denial. And even though the court, the district court allowed plaintiff to supplement the record for the period during which she could have filed an administrative review or one available, it nevertheless gave Unum the benefit of an abuse of discretion review when it is undisputed that Unum didn't consider all of the evidence in the record in reaching its decision. And the objective of that remedy is to put plaintiff in the position she would have been in had Unum not violated her right to full and fair review. Can I ask about that? I guess I'm kind of new to these cases, and so maybe the judge, my colleagues have to tell me more about this, but why didn't they just send it back? It sounds like that's what Unum thought they did or acted like that's what the court had done, but why didn't the judge just send it back and you didn't give them, you know, you changed your mind, and so therefore they didn't, Gary didn't get an appeal. So why don't just send it back and say start over again, as opposed to this weird process where you sort of supplement the record, but then there was a fight about what could be in the record. I don't know, your honor, but that what the district court chose as the remedy was supplementing the record. So question that I've got is if we send it, if we were to send this back, because of, you know, should we order to just start over again? I mean, you know, we'd go back to that date, back to start over and have Unum do it all over again, or why would that not be appropriate? I think you would send it back to the district court to apply the correct standard of review on the record that exists, but my third point is this court should not remand this case. This court is in exactly the same position as the to decide whether Unum wrongly denied benefits and remanding this case would simply extend for another several years, the delay and the impacts of this case on particularly on plaintiff. And this court has, when it thought it that's what you do here. Okay, thank you very much. Your time is up. So Gary versus Unum Life Insurance Company is submitted and we are in recess. Thank you very much. Thank you. Thank you, counsel.
judges: Berzon, Collins, Vandyke